## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Cargill, Incorporated, on behalf of itself and as assignee and subrogee of Leprino Foods Company | Case No. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | |
| Ron Burge Trucking, Inc. & National Interstate Insurance Corp., | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Plaintiff Cargill, Incorporated (Cargill) states for its Complaint against Defendants Ron Burge Trucking, Inc. (Burge) and National Interstate Insurance Corp. (National Interstate), as follows:

### I.    PARTIES

1.    Plaintiff Cargill is a Delaware corporation with its principal place of business at 15407 McGinty Road West, Wayzata, MN 55391.  Cargill, among other things, is an international manufacturer, distributer, and seller of agriculture, food, and industrial products.

2.    Leprino Foods Company manufactures food products at various facilities around the United States and the world.  It has a long-standing and substantial business relationship with Cargill, including contracts for the purchase of salt for use in making cheese.

3.    Defendant Burge is an Ohio trucking corporation with its principal place of business at 1876 West Britton Road, Burbank, OH 44214.

4.     Upon information and belief, Defendant National Interstate Insurance Corp. is an Ohio corporation, with its principal place of business at 3250 Interstate Drive, Richfield, OH 44286.   It is engaged in the business of selling insurance policies, including policies for commercial general liability insurance.

## II.     JURISDICTION AND VENUE

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 based on complete diversity between the parties and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the Motor Transport Agreement, the contract at issue in this matter, contains an express forum selection clause, stating that Minnesota is a proper venue for matters arising from the Motor Transport Agreement.

## III.     GENERAL ALLEGATIONS

7.     On June 23, 2006, Cargill and Leprino entered National Purchasing Master Agreement.

8.     The National Purchasing Master Agreement requires Cargill to provide salt fit for use in food that is merchantable, good quality, and free from faults and defects.

9.     To deliver its food salt to Leprino, Cargill contracted with Burge for transport services.

10.     On August 31, 2006, Cargill and Burge entered into a Motor Transport Agreement.

11.     Under the Motor Transport Agreement, Burge expressly agreed to transport Cargill's salt to Leprino for use in its food products.  It agreed that it would be "responsible for and liable for all loss or damage to any Product transported hereunder that occurs from the time Product is loaded into Carrier's equipment until delivery has been completed," that it would "provide, at its own cost and expense, vehicles and equipment which are in good, clean, sanitary condition, free of contaminants, and suitable for hauling Cargill's products,"  and that it would provide equipment "in proper working order and in condition suitable to be loaded per Cargill Salt requirements."

12.     Under the Motor Transport Agreement, Burge expressly agreed to indemnify Cargill for damages caused by its acts and omissions:

> Section 8.  Indemnification
>
> Carrier agrees to indemnify, defend, and hold harmless Cargill, its directors, officers, employees, agents or representatives, and its successors and assigns, from and against any injury, damage, claims, suits, fines, penalties or loss, including, but not limited to, reasonable attorney's fees, to the extent such injuries, damages, or losses arise from i) Carrier's performance or attempted performance hereunder, ii) and negligent, reckless, or willful misconduct of Carrier, or its employees or agents, iii) any act or omission of Carrier or its employees or agents; or iv) the breach of any obligation or covenant in this Agreement.

13.     Burge's Agreement with Cargill further provided that Burge would "procure and maintain at its expense Commercial General Liability Insurance, including blanket contractual coverage, for bodily and property damage in the amount of One Million Dollars ($1,000,000.00) combined single limit per occurrence."

14.     Burge further agreed to furnish a certificate of insurance naming Cargill as an additional insured.

15.     Burge was insured under Policy GLT 001000209, by National Interstate. (Exhibit A.)

16.     Burge furnished a certificate of insurance naming Cargill as an additional insured on Policy GLT 001000209.  (Exhibit B.)

17.     Policy GLT 001000209 is a commercial general liability policy that provides for coverage for property damage claims brought against insureds.  It states National Interstate will pay damages for property damage covered by the Policy and will defend against such claims.  The Policy further states that it applies "separately to each insured against whom claim is made or 'suit' is brought."  (Exhibit A section 4.7.) Coverage limits are $1,000,000 for each occurrence or accident.

18.     On April 14, 2010 Burge used trailer #120 to haul roofing aggregate.

19.     On April 18, 2010, Burge misrepresented to Cargill that the previous backhaul for trailer #120 was limestone.  Cargill loaded Burge's trailer #120 with salt for delivery to Leprino at Leprino's facility in Remus, MI. The delivery was order # 2512781, shipment # 8555316.

20.     According to Burge's "Tank Cleaning and Inspection Form," dated April 16, 2010, for order # 2512781, previous backhaul for trailer # 120 was limestone, not roofing aggregate.  Trailers that hauled roofing aggregate require additional cleaning procedures to be safe to haul food salt.  Upon information and belief, Burge washed trailer #120 according to the requirements for trailers that previously hauled limestone, and not according to the requirements for trailers that hauled roofing aggregate.  When

Cargill's salt was loaded into Burge's trailer # 120, Burge's trailer # 120 contained roofing aggregate, and Cargill's salt became contaminated by the roofing aggregate.

21.     Cargill's quality assurance procedures relied on Burge to provide uncontaminated trailers safe and sanitary for hauling food salt, to use proper cleaning procedures, and to accurately identify previous backhaul.

22.     On April 19, Leprino received salt shipment # 8555316, and Leprino started using the salt from shipment # 8555316 to make cheese.

23.     Leprino's quality assurance procedures relied on Cargill to supply salt free of contaminants.  Leprino did not detect contaminants in salt shipment # 8555316 until April 26, 2010.  The next day Leprino informed Cargill and provided samples to Cargill. Leprino reported that it had produced close to a million pounds of mozzarella cheese with the contaminated salt.

24.     Cargill immediately initiated its investigation into the contaminants found by Leprino in salt shipment # 8555316.   Cargill found nothing that matched the contaminants that could have come from its own facility.  Cargill next assumed the contaminants were limestone because Burge's previous back-haul indicated limestone. Cargill sent the contaminants to a laboratory for quick analysis.

25.     Cargill also requested the Bills of Lading for prior shipments from Burge. As a result, on April 29, 2010, Cargill discovered that Burge misrepresented its actual back-haul and that trailer # 120 had actually been used to haul roofing aggregate.  Cargill obtained a sample of the roofing aggregate and it matched the contaminant found by Leprino in the salt.

26.     Cargill immediately notified Leprino of the nature of the contamination, and Leprino stopped using salt from salt shipment # 8555316 and withdrew cheese made with salt from that shipment.  Leprino also stopped using Cargill as a supplier for salt at two of its locations, causing Cargill to lose profits and suffer damage to its business relationship with Leprino.

27.     Cargill immediately notified Burge that Burge had contaminated the salt with its roofing aggregate and had misidentified previous backhaul for trailer # 120. Cargill stopped using Burge for shipping its products.

28.     In June 2010, Cargill notified Burge it was withholding payment based on the incident.  Cargill has withheld payment of $71,526.63 to compensate it, in part, for its damages from the incident.

29.     On August 16, 2010, Leprino submitted a formal claim for reimbursement to Cargill for $2.4 million, with a binder of supporting documents.

30.     On September 7, 2010, Cargill notified National Interstate of its claim for indemnity and defense as an additional insured under Policy GLT 001000209, which was in effect in April 2010 when Burge contaminated salt shipment # 8555316 and delivered it to Leprino.

31.     Policy GLT 001000209 provided coverage for Leprino's claims against Cargill arising from Burge's contamination of salt shipment # 8555316 because such claims were for property damage and were not within the scope of any exclusion in the Policy.

32.     On September 20, 2010, National Interstate agreed to represent and defend Cargill under a reservation of rights.  The only issues identified in the reservation-of-rights letter were that Cargill waited until September to notify National Interstate of Leprino's claim and the possibility Cargill would in the future settle with Leprino without consent from National Interstate.

33.     National Interstate retained the law firm of Cardelli Lanfear & Buikema to jointly represent both Cargill and Burge, despite the conflicts of interest between Cargill and Burge.

34.     Cargill repeatedly requested separate, unconflicted representation, but National Interstate refused to provide unconflicted representation.

35.     The Cardelli law firm refused to investigate Burge's conduct leading to the contamination of the salt even though Burge's conduct was relevant for Cargill's defense against Leprino's claims.

36.     The Cardelli firm was inattentive and unresponsive to Cargill or Leprino's attempts to further investigation or negotiate settlement despite numerous attempts by Cargill to obtain its cooperation.

37.     Cargill provided National Interstate and the Cardelli firm with all of the information requested and kept them fully informed of its negotiations with Leprino to resolve its claims.  Cargill obtained from Leprino all of the information and evidence requested by National Interstate and the Cardelli firm to analyze Leprino's claims, or provided the opportunity to obtain such evidence.

38.     In June and July 2011, Cargill and Leprino negotiated a tentative settlement to resolve all of Leprino's claims against Cargill arising from Burge's contaminated salt shipment # 8555316, and assigning its claims against Burge to Cargill.

39.     Cargill sent National Interstate a letter on July 1, 2011, requesting its evaluation of Leprino's claims and an explanation of its evaluation.

40.     National Interstate responded with a letter providing no information about its investigation or evaluation of likely potential verdicts.   National Interstate never identified how likely it is that litigation with Leprino would result in a verdict against Cargill over its policy limits.   National Interstate failed to identify any legal or factual basis to contradict the evidence as to Cargill's liability and damages to Leprino for Burge's contaminated salt.   Instead, it claimed Cargill was responsible for Leprino's damages arising from Burge's contaminants in salt shipment # 8555316, but it did not explain the factual or legal basis for this argument.

41.     National Interstate's failure to investigate Leprino's claims against Cargill in a timely manner, refusal to provide unconflicted representation, and refusal to evaluate Leprino's claims or explain its analysis, constituted bad faith.

42.     National Interstate also failed to participate in settlement negotiations or to make a reasonable offer to settle Leprino's claims against Cargill.   Its only offer to settle Leprino's claims was for $205,930.22.   Ignoring the potential business losses it would cause Cargill, National Interstate also informed Cargill that the only way it would increase its offer to Leprino was if Leprino filed suit against Cargill.

43.     Cargill sent National Interstate and Burge a draft of the tentative Settlement Agreement on July 21, 2011, requesting that it tender its limits under the Policy towards the Settlement Agreement, or consent to the Settlement Agreement with Cargill's agreement that National Interstate would not waive its rights under the Policy or its objections the amount of the Settlement Agreement.

44.     Burge, through the Cardelli firm, refused to acknowledge any potential liability by Burge.

45.     National Interstate denied Cargill's request that it tender its Policy limits towards the settlement agreement on August 3, 2011.  It again insisted that Cargill and Leprino were responsible for damages from Burge's contaminants.  It also claimed for the first time that it had been denied the opportunity to inspect Leprino's facility, a request that Cargill is not aware that National Interstate had previously made, nor aware that it had ever been refused.  It also referred to "jury verdict research" that had not been shared with Cargill despite its previous requests for National Interstate's evaluation. National Interstate acknowledged that Cargill may suffer business losses if it did not settle the Leprino claim, yet refused to give its consent to Cargill to enter the settlement agreement on the basis that National Interstate was not liable for Cargill's business losses. National Interstate's refusal to tender its policy limits towards the Settlement Agreement constituted bad faith.

46.     National Interstate's refusal to consent to Cargill's execution of the Settlement Agreement constituted bad faith.

## IV.    CAUSES OF ACTION

### Claim I—Breach of Contract
### (Burge)

51.    Cargill incorporates in this paragraph the allegations set forth in paragraphs 1 through 50 as if they were set forth in full in this paragraph.

52.    Cargill entered into a valid and enforceable contract with Burge for the transportation of food salt by entering the Motor Transport Agreement.

53.    In the Motor Transport Agreement, Burge expressly agreed that it is "responsible for and liable for all loss or damage to any Product transported hereunder that occurs from the time Product is loaded into Carrier's equipment until delivery has been completed," that it would "provide, at its own cost and expense, vehicles and equipment which are in good, clean, sanitary condition, free of contaminants, and suitable for hauling Cargill's products," and that it would provide equipment "in proper working order and in condition suitable to be loaded per Cargill Salt requirements."

54.    Burge further promised to indemnify, defend, and hold Cargill harmless for damages caused by Burge's performance of its obligations under the Motor Transport Agreement.

55.    Burge breached the Motor Transport Agreement by providing trailer # 120 contaminated with roofing aggregate and contaminating Cargill's salt, by falsely stating that limestone was the previous backhaul for trailer # 120, and by failing to inform Cargill that roofing aggregate was a previous backhaul.  Burge further breached the

Motor Transport Agreement by refusing to compensate Cargill for the damages it incurred because of Burge's contamination of salt shipment # 8555316.

56.     As a direct and proximate result of Burge's breach of contract, Cargill's salt was contaminated by roofing aggregate.

57.     As a direct and proximate result of Burge's breach of contract, Leprino used the contaminated salt to make cheese, making such cheese un-sellable and causing Leprino to suffer property damage to its cheese.  Leprino also suffered other incidental and consequential damages. These losses were foreseeable consequences of Burge's contamination of salt shipment # 8555316 with roofing aggregate.  Cargill was liable under the National Purchasing Agreement it entered with Leprino for Leprino's damages.

58.     As a direct and proximate result of Burge's breach of contract, Cargill lost business with Leprino, causing it to suffer substantial lost profits, damage to its business relationship with Leprino, damaged reputation, and lost business opportunities.  These losses were foreseeable consequences of Burge's contamination of salt shipment # 8555316 with roofing aggregate.

59.     Burge's breach of the Motor Transport Agreement caused Cargill to suffer damages in excess of $2,000,000.

**Claim II—Breach of Express Warranty**
(Burge)

60.     Cargill incorporates in this paragraph the allegations set forth in paragraphs 1 through 59 as if they were set forth in full in this paragraph.

61.   Cargill's Motor Transport Agreement with Burge includes numerous express warranties regarding Burge's handling and shipping of Cargill's salt, including its warranties that it is "responsible for and liable for all loss or damage to any Product transported hereunder that occurs from the time Product is loaded into Carrier's equipment until delivery has been completed," that it would provide "vehicles and equipment which are in good, clean, and sanitary condition, free of contaminants, and suitable for hauling Cargill's products," and that it would provide equipment "in proper working order and in condition suitable to be loaded per Cargill Salt requirements."

62.   Burge's warranties were material to the Motor Transport Agreement and Cargill reasonably relied on Burge's warranties by incorporating Burge's warranties into its quality assurance program for its food salt and by using Burge's services to transport food salt to Leprino.

63.   Burge breached these express warranties by providing trailer # 120 for loading while contaminated with roofing aggregate, by falsely stating that limestone was the previous backhaul for trailer # 120, and by failing to inform Cargill that roofing aggregate was a previous backhaul.   Trailer # 120 was not free of contaminants or suitable for food salt and not in a condition to be loaded in accordance with Cargill salt requirements.

64.   When Cargill discovered salt shipment # 8555316 was contaminated, it immediately notified Burge of that contamination.   When it discovered that the contaminants were roofing aggregate from backhaul from Burge's trailer # 120, it immediately notified Burge of that fact.   Cargill has repeatedly informed Burge that its

contamination of salt shipment # 8555316 breached its warranties under the Motor Transport Agreement and demanded compensation.

65.     As a direct and proximate result of Burge's breach of these express warranties, Leprino used the contaminated salt to make cheese, making such cheese un-sellable and causing Leprino to suffer property damage to its cheese. Leprino also suffered other incidental and consequential damages.  Cargill is liable under the National Purchasing Agreement it entered with Leprino for Leprino's damages.  These losses were foreseeable consequences of Burge's contamination of salt shipment # 8555316 with roofing aggregate.

66.     As a further direct and proximate result of Burge's breach of express warranties, Cargill lost business with Leprino, causing it to suffer substantial lost profits, damage to its business relationship with Leprino, damage to Cargill's reputation, and lost business opportunities.   These losses were foreseeable consequences of Burge's contamination of salt shipment # 8555316 with roofing aggregate.

67.     Burge's breach of its warranties in the Motor Transport Agreement caused Cargill to suffer damages in excess of $2,000,000.

### Claim III─ Breach of Implied Warranties
(Burge)

68.     Cargill incorporates in this paragraph the allegations set forth in paragraphs 1 through 67 as if they were set forth in full in this paragraph.

69.     Burge knew or should have known that the salt it hauled for Cargill was intended for use in food products; that roofing aggregate contaminated salt intended for

food products; and that trailers used to haul roofing aggregate required additional cleaning procedures to be safe to haul food salt without risk of contamination.

70.    These facts were material to Burge's performance of its obligations under the Motor Transport Agreement and Cargill relied on Burge in its quality assurance plan to provide uncontaminated trailers safe for transporting salt for use in food.

71.    By providing a trailer to Cargill for hauling food salt to Leprino under the Motor Transport Agreement, Burge implied that the trailer was fit for that purpose and had been cleaned and prepared for that purpose in a workmanlike manner.

72.    Burge breached the implied warranties of fitness for a particular purpose and workmanlike performance by providing trailer # 120 contaminated with roofing aggregate, a condition not fit for the purpose of transporting food salt and the result of its failure to prepare the trailer in a workmanlike manner.

73.    Cargill had no knowledge that Burge's trailer # 120 was contaminated by roofing aggregate because Burge failed to inform Cargill that the trailer had been used to haul roofing aggregate.  Burge misrepresented that it had hauled limestone, a permitted backhaul.  Due to Burge's misrepresentation, Cargill had no reasonable means to detect roofing aggregate contamination in trailer # 120.  Further, Cargill contracted with Burge and relied on Burge to provide uncontaminated trailers.

74.    When Cargill discovered salt shipment # 8555316 was contaminated, it immediately notified Burge of that contamination.   When it discovered that the contaminants were roofing aggregate from backhaul from Burge's trailer # 120, it immediately notified Burge of that fact.  Cargill has repeatedly informed Burge that its

contamination of salt shipment # 8555316 breached its warranties under the Motor Transport Agreement and demanded compensation.

75.     As a direct and proximate result of Burge's breach of its implied warranty to provide uncontaminated trailers safe for hauling food salt, Leprino used the contaminated salt to make cheese, making such cheese un-sellable and causing Leprino to suffer property damage to its cheese.   Leprino also suffered other incidental and consequential damages.   Cargill is liable under the National Purchasing Agreement it entered with Leprino for Leprino's damages.   These losses were foreseeable consequences of Burge's contamination of salt shipment # 8555316 with roofing aggregate.

76.     As a further direct and proximate result of Burge's breach of implied warranties, Cargill lost business with Leprino, causing it to suffer substantial lost profits, damage to its business relationship with Leprino, damage to Cargill's reputation, and lost business opportunities.   These losses were foreseeable consequences of Burge's contamination of salt shipment # 8555316 with roofing aggregate.

77.     Burge's breach of its implied warranties in the Motor Transport Agreement caused Cargill to suffer damages in excess of $2,000,000.

### Claim IV─Negligence
(Burge)

78.     Cargill incorporates in this paragraph the allegations set forth in paragraphs 1 through 77 as if they were set forth in full in this paragraph.

79.     Burge owed a duty to Cargill to use reasonable care in transporting its food salt to Leprino.

80.     Burge breached this duty by providing a trailer for Cargill's food salt contaminated by roofing aggregate, by failing to inform Cargill the trailer had been used to haul roofing aggregate, and by misrepresenting the previous backhaul.

81.     As a direct and proximate result of Burge's negligence, Leprino used the contaminated salt to make cheese, making such cheese un-sellable and causing Leprino to suffer property damage to its cheese.   Leprino also suffered other incidental and consequential damages.   Cargill is liable under the National Purchasing Agreement it entered with Leprino for Leprino's damages.    These losses were foreseeable consequences of Burge's contamination of salt shipment # 8555316 with roofing aggregate.

82.     As a further direct and proximate result of Burge's negligence, Cargill lost business with Leprino, causing it to suffer substantial lost profits, damage to its business relationship with Leprino, damage to Cargill's reputation, and lost business opportunities. These losses were foreseeable consequences of Burge's contamination of salt shipment # 8555316 with roofing aggregate.

83.     Burge's negligence caused Cargill to suffer damages in excess of $2,000,000.

## Claim V— Misrepresentation
(Burge)

84.     Cargill incorporates in this paragraph the allegations set forth in paragraphs 1 through 83 as if they were set forth in full in this paragraph.

85.     Burge had a duty to convey accurate information to Cargill regarding previous backhaul for trailers used to transport Cargill's food salt.

86.     Burge knew Cargill relied on it to provide accurate information about previous backhaul for trailers used to transport Cargill's food salt.

87.     Burge knew trailer # 120's previous backhaul was roofing aggregate.

88.     Burge misrepresented to Cargill that trailer # 120's previous backhaul was limestone.

89.     Burge misrepresented # 120's previous backhaul knowing the statement to be false, without regard to whether the statement was true or false, and without making a reasonable effort to ensure its statement was true.

90.     Cargill reasonably relied on Burge's representation regarding previous backhaul.  The previous backhaul used in Burge's trailer is important and material to Cargill because many substances, like roofing aggregate, can contaminate food salt. Cargill relied on Burge to ensure no such contaminants were present in the trailers Burge used to transport Cargill's food salt, including on April 18, 2010, when it relied on Burge's representation that trailer # 120's previous backhaul was limestone, and not any other substances.

91.    As a direct and proximate result of Burge's misrepresentation to Cargill, Burge contaminated Cargill's salt.  Leprino used the contaminated salt to make cheese, making such cheese un-sellable and causing Leprino to suffer property damage to its cheese.  Leprino also suffered other incidental and consequential damages.  Cargill is liable under the National Purchasing Agreement it entered with Leprino for Leprino's damages.  These losses were foreseeable consequences of Burge's contamination of salt shipment # 8555316 with roofing aggregate.

92.    As a further direct and proximate result of Burge's misrepresentation, Cargill lost business with Leprino, causing it to suffer substantial lost profits, damage to its business relationship with Leprino, damage to Cargill's reputation, and lost business opportunities.  These losses were foreseeable consequences of Burge's contamination of salt shipment # 8555316 with roofing aggregate.

93.    Burge's misrepresentation caused Cargill to suffer damages in excess of $2,000,000.

### Claim VI─Leprino's Breach of Warranty and Negligence Claims against Burge, which were Subrogated and Assigned to Cargill
(Burge)

94.    Cargill incorporates in this paragraph the allegations set forth in paragraphs 1 through 93 as if they were set forth in full in this paragraph.

95.    Leprino reasonably expected and intended to use and consume the salt delivered in shipment  # 8555316 for making cheese.

96.    Burge knew Leprino expected and intended to use and consume the salt delivered in shipment  # 8555316 for making cheese.

97.    Burge had a duty to Leprino to not contaminate the salt delivered in shipment # 8555316.

98.    Burge negligently contaminated the salt delivered in shipment # 8555316 to Leprino.

99.    Burge breached its express and implied warranties to Leprino under the Motor Transport Agreement by contaminating salt shipment # 8555316 with roofing aggregate.

100.    As a direct and proximate result of Burge's negligence and Burge's breach of its express and implied warranties, Leprino used Burge's contaminated salt to make cheese, making such cheese un-sellable and causing Leprino to suffer property damage to its cheese.  Leprino also suffered other incidental and consequential damages.  Leprino's losses were foreseeable consequences of Burge's contamination of salt shipment # 8555316 with roofing aggregate.

101.    Leprino had causes of action against Burge for negligence and breach of express and implied warranties.

102.    According to the terms of the Settlement Agreement, Leprino transferred and assigned to Cargill all of its claims arising from Burge's contamination of salt shipment # 8555316.

103.    By its payment to Leprino for its damages caused by Burge's contamination of salt shipment # 8555316, Cargill is subrogated to Leprino's claims against Burge for such contamination.

104.    Cargill is entitled to recover from Burge all of Leprino's losses caused by Burge's contamination of salt shipment # 8555316.

### Claim VII─Contractual Indemnity
(Burge)

105.    Cargill incorporates in this paragraph the allegations set forth in paragraphs 1 through 104 as if they were set forth in full in this paragraph.

106.    Under the Motor Transport Agreement, Burge expressly agreed to indemnify, defend, and hold harmless Cargill for damages caused by its performance under the contract, its negligent conduct, its acts or omissions, or its breach of the terms of the Agreement.

107.    Burge undertook to transport salt shipment # 8555316 pursuant to the terms of the Motor Transport Agreement.   In doing so, Burge caused the shipment to be contaminated with roofing aggregate.

108.    As a direct and proximate result of Burge's contamination of salt shipment # 8555316, Leprino used Burge's contaminated salt to make cheese, making such cheese un-sellable and causing Leprino to suffer property damage to its cheese.   Leprino also suffered other incidental and consequential damages.

109.    Leprino sought to recover from Cargill its damages caused by Burge's contamination of salt shipment # 8555316.   Cargill was liable for Leprino's damages because it warranted to Leprino in the National Purchasing Agreement that its salt would be safe and free from faults and defects.

110.    Leprino's claim against Cargill arose because Burge contaminated the salt and misidentified previous backhaul for trailer # 120, which occurred in the course of Burge's performance of its duties under the Motor Transport Agreement.

111.    Upon learning that Burge contaminated salt shipment # 8555316 with roofing aggregate, Cargill notified Burge of its damages and of Leprino's damages and sought compensation.

112.    Despite several requests from Cargill, Burge has failed and refused to indemnify and hold Cargill harmless from the losses and damages resulting to Cargill from Burge's contamination of salt shipment # 8555316 with roofing aggregate.

113.    Burge's failure and refusal to indemnify and hold Cargill harmless constitutes a breach of its duties to indemnify and defend Cargill.  As a direct result of the breach, Cargill has been damaged in the amount of its losses and damages, currently in excess of $2,000,000, together with its attorney fees.

114.    Cargill entered a Settlement Agreement with Leprino by which Cargill reasonably compensated Leprino for its damages.

115.    Cargill is entitled to full indemnification from Burge for the amount of the Settlement Agreement as well as Cargill's own damages, including its attorney fees.

### Claim VIII—Common Law Indemnity
(Burge)

116.   Cargill incorporates in this paragraph the allegations set forth in paragraphs 1 through 115 as if they were set forth in full in this paragraph.

117.   As a direct and proximate result of Burge's contamination of salt shipment # 8555316, Leprino used Burge's contaminated salt to make cheese, making such cheese un-sellable and causing Leprino to suffer property damage to its cheese.  Leprino also suffered other incidental and consequential damages.

118.   Leprino sought to recover from Cargill its damages caused by Burge's contamination of salt shipment # 8555316.  Cargill was liable for Leprino's damages because it warranted to Leprino in the National Purchasing Agreement that its salt would be safe and free from faults and defects.

119.   Leprino's claim against Cargill arose because Burge contaminated its salt and misidentified previous backhaul for trailer # 120, which occurred in the course of Burge's performance of its duties under the Motor Transport Agreement.

120.   Upon learning that Burge contaminated salt shipment # 8555316 with roofing aggregate, Cargill notified Burge of Leprino's damages and sought compensation.

121.   Despite several requests from Cargill, Burge has refused to indemnify Cargill from the losses and damages resulting to Cargill from Leprino's claims against it.

122.   Cargill entered a Settlement Agreement with Leprino by which Cargill reasonably compensated Leprino for its damages.

123.   Cargill is entitled to full indemnification for the amount of the Settlement Agreement and its attorney fees.

### Claim IX—Contribution
### (Burge)

124.   Cargill incorporates in this paragraph the allegations set forth in paragraphs 1 through 123 as if they were set forth in full in this paragraph.

125.   As a direct and proximate result of Burge's contamination of salt shipment # 8555316, Leprino used Burge's contaminated salt to make cheese, making such cheese un-sellable and causing Leprino to suffer property damage to its cheese.  Leprino also suffered other incidental and consequential damages.

126.   Leprino sought to recover from Cargill its damages caused by Burge's contamination of salt shipment # 8555316.  Cargill was liable for Leprino's damages because it warranted to Leprino in the National Purchasing Agreement that its salt would be safe and free from faults and defects.

127.   Leprino's claim against Cargill arose because Burge contaminated its salt and misidentified previous backhaul for trailer # 120, which occurred in the course of Burge's performance of its duties under the Motor Transport Agreement.

128.   Upon learning that Burge contaminated salt shipment # 8555316 with roofing aggregate, Cargill notified Burge of Leprino's damages and sought compensation.

129.   Burge is jointly liable to Leprino for its negligence and breach of warranties regarding its contamination of salt shipment # 8555316.

130.    Despite several requests from Cargill, Burge has refused to contribute any funds to settle Leprino's claims for its losses and damages resulting from Burge's contamination of salt shipment # 8555316 with roofing aggregate.

131.    Cargill entered a Settlement Agreement with Leprino by which Cargill reasonably compensated Leprino for a portion of its damages.

132.    Cargill is entitled to full contribution for the amount of the Settlement Agreement and its attorney fees.

### Claim X—Breach of Contract
(National Interstate)

133.    Cargill incorporates in this paragraph the allegations set forth in paragraphs 1 through 132 as if they were set forth in full in this paragraph.

134.    Cargill was insured under Policy GLT 001000209, by National Interstate. National Interstate issued a certificate of insurance naming Cargill as an additional insured on Policy GLT 001000209.  (Exhibit B.)

135.    Policy GLT 001000209 provided coverage for Leprino's claims against Cargill arising from Burge's contamination of salt shipment # 8555316 because such claims were for property damage and were not within the scope of any exclusion in the Policy.

136.    The Policy obligated National Interstate to treat Cargill as an insured separate from Burge.  (Exhibit A, section 4.7.)

137.    National Interstate undertook to defend Cargill from the claims asserted by Leprino for Burge's contamination of salt shipment # 8555316.   National Interstate's

reservation of rights identified only two potential coverage issues: that Cargill provided late notice and that Cargill might in the future settle Leprino's claims without National Interstate's consent.

138.   National Interstate, having undertook to defend Cargill against claims brought by Leprino covered by Policy GLT 001000209, had discretion in the manner by which it defended Cargill from the claims asserted by Leprino for Burge's contamination of salt shipment # 8555316.  National Interstate's discretion was limited by its duties of good faith and fair dealing.

139.   National Interstate breached its duty to defend Cargill in good faith by failing to take reasonable and timely steps to investigate and evaluate Leprino's claims against Cargill regarding Burge's contamination of salt shipment # 8555316, by failing to provide counsel for Cargill's defense free of conflicts of interest, by making only unreasonably low settlement offers, by refusing to inform Cargill of its analysis of Leprino's claims or the Settlement Agreement, by failing to agree and tender funds towards the Settlement Agreement, and by failing to consent to Cargill's execution of the Settlement Agreement.   Cargill expects discovery to reveal additional instances of National Interstate's bad faith in this matter.

140.   National Interstate lacked reasonable justification for this conduct. National Interstate's conduct failed to give as much consideration to Cargill's interests as it gave to its own interests, in that Cargill liability for Burge's contaminated salt is clear and Leprino's $2.4 million damages claim greatly exceeded the $1,000,000 limit for Policy GLT 001000209.  By refusing to timely and reasonably investigate or evaluate

Leprino's claims, and by refusing to participate in or consent to the Settlement Agreement, National Interstate pursued a risky litigation strategy aimed at obtaining a judgment less than the Policy's limits, despite the very low chance of success.  National Interstate preferred this strategy because its liability is limited and Cargill would bear the all of the risk of incurring an excess judgment, the likely outcome.  Had National Interstate given equal weight to Cargill's interests, it would have tendered its Policy limits toward the Settlement Agreement.

141.   Moreover, National Interstate rejected Cargill's offer to let National Interstate preserve objections to coverage and the amount of the Settlement Agreement if National Interstate consented to Cargill's execution of the Settlement Agreement. National Interstate had no reasonable justification to refuse to consent to Cargill's execution of the Settlement Agreement.

142.   Because National Interstate breached its material duty to defend Cargill under Policy GLT 001000209, and favored its own interests over that of Cargill, Cargill was not required to continue complying with the terms of the Policy.  Cargill executed the Settlement Agreement with Leprino on August 8, 2011.

143.   At all times before August 8, 2011, Cargill fully cooperated with National Interstate's investigation and defense of Leprino's claims against Cargill.

144.   National Interstate received or had an opportunity to receive all materials and documents that it requested as necessary for its investigation of Leprino's claims.

145.   As a proximate result of National Interstate's bad faith breach of its duty to defend Cargill, Cargill used its own funds to resolve Leprino's claims against Cargill.

146.    As a proximate result of National Interstate's bad faith breach of its duty to defend Cargill, and to provide an unconflicted defense, Cargill also incurred attorney's fees in resolving Leprino's claims against Cargill.

147.    As a proximate result of National Interstate's bad faith breach of its duty to defend Cargill in a timely manner, Cargill incurred lost profits, damaged business relationships, and damage to reputation, which would have been avoided had National Interstate acted diligently to investigate and evaluate Leprino's claims and obtain a reasonable settlement at an earlier date.

148.    Cargill's damages caused by National Interstate's bad faith exceed $1,000,000.

### Claim XI—Tortious Bad Faith Denial of Insurance Benefits
(National Interstate)

149.    Cargill incorporates in this paragraph the allegations set forth in paragraphs 1 through 148 as if they were set forth in full in this paragraph.

150.    Cargill was insured under Policy GLT 001000209, by National Interstate. National Interstate issued a certificate of insurance naming Cargill as an additional insured on Policy GLT 001000209.  (Exhibit B.)

151.    Policy GLT 001000209 provided coverage for Leprino's claims against Cargill arising from Burge's contamination of salt shipment # 8555316 because such claims were for property damage and were not within the scope of any exclusion in the Policy.

152.   The Policy obligated National Interstate to treat Cargill as an insured separate from Burge.  (Exhibit A, section 4.7.)

153.   National Interstate undertook to defend Cargill from the claims asserted by Leprino for Burge's contamination of salt shipment # 8555316.   National Interstate's reservation of rights identified only two potential coverage issues: that Cargill provided late notice and that Cargill might in the future settle Leprino's claims without National Interstate's consent.

154.   As Cargill's insurer, National Interstate had a duty to act in good faith in defending Cargill against Leprino's claims and to give Cargill's interests equal weight with its own interests.

155.   National Interstate breached its duty to defend Cargill in good faith by failing to take reasonable and timely steps to investigate and evaluate Leprino's claims against Cargill regarding Burge's contamination of salt shipment # 8555316, by failing to provide counsel for Cargill's defense free of conflicts of interest, by making only unreasonably low settlement offers, by failing to inform Cargill of its analysis of Leprino's claims or the Settlement Agreement, by failing to agree and tender funds towards the Settlement Agreement, and by failing to consent to Cargill's execution of the Settlement Agreement.   Cargill expects discovery to reveal additional instances of National Interstate's bad faith in this matter.

156.   National Interstate lacked reasonable justification for this conduct. National Interstate's conduct failed to give as much consideration to Cargill's interests as it gave to its own interests, in that Cargill liability for Burge's contaminated salt is clear

and Leprino's $2.4 million damages claim greatly exceeded the $1,000,000 limit for Policy GLT 001000209.  By refusing to timely and reasonably investigate or evaluate Leprino's claims, and by refusing to participate in or consent to the Settlement Agreement, National Interstate pursued a risky litigation strategy aimed at obtaining a judgment less than the Policy's limits, despite the very low chance of success.  National Interstate preferred this strategy because its liability is limited and Cargill would bear the all of the risk of incurring an excess judgment, the likely outcome.  Had National Interstate given equal weight to Cargill's interests, it would have tendered its Policy limits toward the Settlement Agreement.

157.   Moreover, National Interstate rejected Cargill's offer to let National Interstate preserve objections to coverage and the amount of the Settlement Agreement if National Interstate consented to Cargill's execution of the Settlement Agreement. National Interstate had no reasonable justification to refuse to consent to Cargill's execution of the Settlement Agreement.

158.   Because National Interstate acted in bad faith, breaching its duty to defend Cargill under Policy GLT 001000209, Cargill was not required to continue complying with the terms of the Policy.  Cargill executed the Settlement Agreement with Leprino on August 8, 2011.

159.   At all times before August 8, 2011, Cargill fully cooperated with National Interstate's investigation and defense of Leprino's claims against Cargill.

160.   National Interstate received or had an opportunity to receive all materials and documents that it requested as necessary for its investigation of Leprino's claims.

161.    As a proximate result of National Interstate's bad faith breach of its duty to defend Cargill, Cargill used its own funds to resolve Leprino's claims against Cargill.

162.    As a proximate result of National Interstate's bad faith breach of its duty to defend Cargill, and to provide an unconflicted defense, Cargill also incurred attorney's fees in resolving Leprino's claims against Cargill.

163.    As a proximate result of National Interstate's bad faith breach of its duty to defend Cargill in a timely manner, Cargill incurred lost profits, damaged business relationships, and damage to reputation, that would have been avoided had National Interstate acted diligently to investigate and evaluate Leprino's claims and obtain a reasonable settlement at an earlier date.

164.    Cargill's damages caused by National Interstate's tortious bad faith exceed $1,000,000.

### Claim XII—Breach of Fiduciary Duty
(National Interstate)

165.    Cargill incorporates in this paragraph the allegations set forth in paragraphs 1 through 164 as if they were set forth in full in this paragraph.

166.    Cargill was insured under Policy GLT 001000209, by National Interstate. National Interstate issued a certificate of insurance naming Cargill as an additional insured on Policy GLT 001000209.  (Exhibit B.)

167.    Policy GLT 001000209 provided coverage for Leprino's claims against Cargill arising from Burge's contamination of salt shipment # 8555316 because such

claims were for property damage and were not within the scope of any exclusion in the Policy.

168.   The Policy obligated National Interstate to treat Cargill as an insured separate from Burge.  (Exhibit A, section 4.7.)

169.   As National Interstate's insured, Cargill had a fiduciary relationship with National Interstate. An insurer's bad faith breach of its duty to defend its insured constitutes breach of the insurer's fiduciary duties.

170.   National Interstate's breach of its duty to defend Cargill in good faith constitutes a breach of its fiduciary duties to Cargill.

171.   As a proximate result of National Interstate's bad faith breach of its duty to defend Cargill, Cargill used its own funds to resolve Leprino's claims against Cargill.

172.   As a proximate result of National Interstate's breach of fiduciary duties to Cargill, Cargill incurred losses in the amount of the funds it used to resolve Leprino's claims, the funds incurred attorney's fees in resolving Leprino's claims against Cargill, and the value of its lost profits, damaged business relationships, and damage to reputation.

173.   Cargill's damages caused by National Interstate's breach of fiduciary duties exceed $1,000,000.

## V.    JURY TRIAL DEMAND

Cargill respectfully demands a jury trial on all issues so triable.

## VI.    PRAYER FOR RELIEF

WHEREFORE, plaintiff Cargill, Inc. prays for judgment against defendant Ron Burge Trucking, Inc. and defendant National Interstate Insurance Corp. as follows:

A.    Judgment against Ron Burge Trucking, Inc. to compensate Cargill for all general, special, incidental and consequential damages that it suffered as a result of Burge's conduct, which exceed $2,000,000, including but not limited to the amount of Cargill's Settlement Agreement with Leprino, Cargill's lost profits for 2010 and 2011 and into the future, damage to business reputation, damage to long-term customer relationships, and attorneys' fees incurred in defending Leprino's claims.

B.    Judgment against National Interstate Insurance Corp. to compensate Cargill for its losses in the amount of the funds it used to resolve Leprino's claims, the funds incurred attorney's fees in resolving Leprino's claims against Cargill, and the value of its lost profits, damaged business relationships, damage to reputation lost because of its unreasonable investigation and evaluation, and attorneys' fees incurred in defending Leprino's claims.

C.    An award of costs, disbursements and attorney fees in favor of Cargill and against National Interstate and Burge as a result of Cargill being required to bring this action to establish its contractual rights and for indemnification for damages directly and proximately caused by Burge.

D.    Such additional and/or further relief, including pre- and post-judgment interest, costs, and reasonable attorney fees, as this Court deems just and equitable.

Dated:  August 19, 2011

NILAN JOHNSON LEWIS PA

By___s/Cynthia P. Arends_____

Cynthia P. Arends     Reg. No. 301735
Benjamin J. Rolf     Reg. No. 386413
400 One Financial Plaza
120 South Sixth Street
Minneapolis, MN  55402-4501
carends@nilanjohnson.com
brolf@nilanjohnson.com
Telephone:  (612) 305-7500
Facsimile:  (612) 305-7501

*Attorneys for Plaintiff Cargill, Inc.*